UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Civil No. 05-598 (RHK/AJB) |
| Petitioner, | |
| v. | **REPORT AND RECOMMENDATION ON THE PETITION OF THE UNITED STATES TO DETERMINE THE PRESENT MENTAL CONDITION OF DEFENDANT** |
| GIUSEPPE GALLARA, | |
| Respondent. | |

The above-entitled matter came on for hearing before Magistrate Judge Arthur J. Boylan on May 5, 2005, at the Federal Medical Center ("FMC") in Rochester, Minnesota, on the petition of the United States, pursuant to 18 U.S.C. § 4245, to determine the present mental condition of Respondent Giuseppe Gallara. Petitioner seeks an Order committing Respondent to the custody of the Attorney General for care and treatment of his mental disease or defect in an appropriate mental health facility such as FMC Rochester. Assistant Federal Public Defender Scott Tilsen represented Respondent. Assistant United States Attorney Mary Trippler appeared on behalf of the United States.

At the hearing, Daniel J. Shine, Jr., M.D., Staff Psychiatrist at FMC Rochester, testified on behalf of the Petitioner. The Court admitted into evidence without objection the following exhibits: Government Exhibit 1 (Curriculum Vitae of Dr. Shine), Government Exhibit 2 (Mental Health Evaluation dated March 10, 2005), Exhibit 3 (Respondent's Medical Records), Exhibit 4 (Respondent's Central File), and Exhibit 5 (Respondent's Presentence Investigation).[1] Respondent called no witnesses and offered no exhibits.

The matter is before Magistrate Judge Boylan for a Report and Recommendation pursuant to the

---

[1] Exhibit 5 was admitted under seal without objection.

provisions of 28 U.S.C. § 636(b)(1)(B). Upon the following Findings of Fact and Conclusions of Law, it is recommended that:

1. The Petition to Determine Present Mental Condition of an Imprisoned Person Under 18 U.S.C. § 4245 be granted;

2. Respondent be found to be presently suffering from a mental disease or defect for the treatment of which he is in need of hospitalization in a suitable psychiatric facility;

3. FMC Rochester be found a suitable facility at which to treat Respondent's mental illness;

4. Respondent be committed to the custody of the United States Attorney General; and

5. The Attorney General hospitalize Respondent at FMC Rochester or similar mental health facility.

## I.   APPLICABLE LAW

Under 18 U.S.C. § 4245, an inmate who is serving time in a federal prison may not be committed to a mental hospital for care and treatment absent the inmate's consent or a court order. 18 U.S.C. § 4245. See United States v. Watson, 893 F.2d 970, 975 (8th Cir. 1990)(vacated in part on other grounds by United States v. Holmes, 900 F.2d 1322 (8th Cir. 1990)). If the inmate objects to being committed, the court must order a hearing to determine if there is "reasonable cause to believe that the person may presently be suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility." 18 U.S.C. § 4245(a); United States v. Jones, 811 F.2d 444, 447 (8th Cir. 1987).

"If, after the hearing, the court finds by a preponderance of the evidence that the person is presently suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility, the court shall commit the person to the custody of the Attorney General."

18 U.S.C. § 4245(d). The Attorney General must then hospitalize the prisoner "for treatment in a suitable facility until he is no longer in need of such custody for care or treatment or until the expiration of the sentence of imprisonment, whichever occurs earlier." Id.

In determining whether an inmate should be committed under 18 U.S.C. § 4245, the Court is required to answer three questions: "Is the Respondent suffering from a mental disease or defect? If so, is the Respondent in need of custody for care or treatment of that disease or defect? If so, is the proposed facility a suitable facility?" United States v. Horne, 955 F. Supp. 1141, 1144 (D. Minn. 1997).

## II.   APPLICATION TO RESPONDENT

Dr. Daniel J. Shine, Jr., a staff psychiatrist at the FMC Rochester, was the only witness at the May 5 hearing. Dr. Shine graduated from medical school in 1993 and completed his psychiatric residency in 1997. He is licensed to practice medicine and is board certified in both general psychiatry and forensic psychiatry. He has been a staff psychiatrist at FMC Rochester since 1997, serving as Chief Psychiatrist from 1999 to 2001. He routinely treats and evaluates inmates and performs forensic evaluations for competency to stand trial and the need for hospitalization and treatment. Dr. Shine is also a member of the institution's Risk Assessment Panel which assesses an inmate's risk to himself or others. He participates in teaching medical students and post-doctoral psychology fellows and supervises Mayo Clinic psychiatric residents.

Dr. Shine has been Respondent's treating psychiatrist from February 2005, to the present. He was also responsible for Respondent's care when Respondent was first transferred to FMC Rochester in July 2003, participated in a difficult case conference regarding Respondent in February 2005, and gave a second opinion regarding the need for emergency medication in February 2005.          At the hearing, Dr.

Shine opined that Respondent presently suffers from a mental disease or defect within the meaning of 18 U.S.C. § 4245, namely Schizophrenia, Paranoid Type, for which Respondent is in need of treatment at a suitable facility such as FMC Rochester. The Court finds that Dr. Shine is a credible witness and that his education, training and experience, as well as his understanding of Respondent's psychiatric history and condition, qualify him to render the opinions expressed at the hearing.

**A.     Respondent is Suffering From a Mental Disease or Defect**.

Based upon the testimony of Dr. Shine and Exhibits 1 through 5, the Court finds that the government has met its burden of showing, by a preponderance of evidence, that Respondent is presently suffering from a mental disease or defect within the meaning of 18 U.S.C. § 4245. Specifically, the Court finds that:

1. Respondent is serving two consecutive and one concurrent life sentence for a March` 1997, conviction for Violent Crime in Aid of Racketeering (Murder), RICO Conspiracy, and RICO violations.

2. Dr. Shine's testimony, as well as his March 10, 2005 Mental Health Evaluation, admitted into evidence as Exhibit 2, discloses that Respondent had no history of mental disease or defect when he was first incarcerated. The first psychiatric symptoms were noted in 1999 when Respondent was in USP Terre Haute. He claimed at that time that staff at the institution was attempting to poison him. In January and February 2001, while at FCI Edgefield, Respondent began skipping meals.

3. In February 2001, Respondent was transferred to the United States Medical Center for Federal Prisoners in Springfield, Missouri. He was uncooperative with psychiatric evaluation and began to display unusual behaviors, including laying naked in his room and pulling his knees to his chest. In June, 2001, he was observed to rub water and urine on the floor of his cell; he responded to staff using head gestures. In

July 2001, he was noted to urinate on the floor of his cell regularly; he remained unwilling to converse with medical staff. Throughout this time, Respondent was on a "hunger strike" and received food regularly through forced tube feedings. Dr. Shine testified that Respondent received in excess of 150 tube feedings while he was at Springfield.

    4. In July 2001, Respondent told psychology staff that his unusual behavior was "part of the investigation." He said that, if he avoided urinating in the toilet, the investigation would be derailed. He reported that, if he closed his eyes, he could see the people involved in the investigation. He also said that he believed that everything he was doing in his cell was captured on camera. He was given a provisional diagnosis of Psychotic Disorder, Not Otherwise Specified.

    5. On July 31, 2001, Respondent received emergency antipsychotic medication to which he had a positive response. A petition commenced under 18 U.S.C. § 4245 was withdrawn due to Respondent's positive response to emergency treatment. He was subsequently diagnosed with Schizophrenia, Paranoid Type, and Anti Social Personality Disorder.

    6. Petitioner was transferred to Michigan state custody in February 2002. He ceased taking his antipsychotic medications and again began developing unusual behaviors such as destroying his mattress, refusing food, refusing to talk and urinating on the floor. In December 2002, Respondent was returned to Federal Bureau of Prisons Custody and was placed at USP Atwater, California. There he was observed to be frequently unresponsive, sitting on the floor of his cell naked, urinating and defecating on the floor, and shredding his boxer shorts and tying them around his fingers. Due to these signs of severe mental illness, Respondent was transferred to FMC Rochester in July 2003.

    7. When Respondent arrived at FMC Rochester on July 31, 2003, he was not taking antipsychotic

medication. He was placed in the Special Housing Unit (SHU) pending classification. SHU is a locked unit, the most restrictive housing option at FMC Rochester's hospital. The Martin Unit is a semi-locked ward. The hospital also has an open ward on the hospital's second floor and an inpatient psychiatric unit on the first floor.

8. On his arrival at FMC Rochester, Respondent offered no response when nurses or mental health staff attempted to talk to or interview him. He continued to display minimally responsive behavior for the next several weeks, answering only sporadically or not at all. He was observed to place large amounts of toilet paper in the toilet of his cell and refused to flush the toilet. When he did interact with staff, Respondent appeared to be hostile, paranoid and suspicious. He often refused to eat but was willing to drink a nutritional supplement.

9. On September 17, 2003, Respondent was moved to the semi-locked Martin Unit. He refused to take psychological testing and declined psychiatric medications. On October 16, 2003, Respondent received an incident report for threatening bodily harm to a nurse. The incident arose when Respondent smeared butter on door knobs in the Martin Unit. When the nurse began to clean the door knobs, Respondent swore at the nurse, threatened to strike him and took a threatening pose. Respondent was placed in SHU on administrative detention as a result of the incident. There his pattern of minimal interaction and minimal eating continued. Respondent continued to appear hostile and paranoid, and he continued to refuse psychiatric medication.

10. Respondent was moved back to the Martin Unit in December 2003. At times, he was social with peers but was more often isolated and dismissive of others. He was given the opportunity of leaving the Martin Unit on temporary releases but often refused them. He frequently refused to allow nursing staff

to obtain his vital signs. Respondent refused to move to a less restrictive environment. In March and April 2004, Respondent showed some slight improvement in social interaction and cooperation.

11. On April 26, 2004, Respondent was moved to the hospital's open unit. On May 5, 2004, Respondent requested to go back to the Martin Unit, complaining of too much stress in the open unit. He described a fear that he would be assaulted by various groups because he breaks the prison code by talking to people. He reported being uncomfortable with Dr. Shine, saying that it was not because he was not attracted to him. Respondent also requested antipsychotic medication. He was moved to the Martin Unit, and the requested medication was prescribed.

12. On May 10, 2004, Respondent asked that the antipsychotic medication be discontinued because he felt "lousy." He was admitted to the inpatient psychiatric ward on May 27, 2004. He refused psychiatric medication and often appeared guarded and socially isolated. When interviewed by psychology staff, he said several times that the room was bugged. He also believed that there were cameras all over the building watching him and told a nurse that he knew they sent the nurse to get information from him. He denied being paranoid but frequently contradicted himself. For example, on August 19, 2004, he told a nurse, "I am not paranoid, but I don't trust anyone. I don't even trust you."

13. On November 17, 2004, Respondent asked to be placed in SHU because he feared for his life. He was placed in SHU until November 24, 2004, when he went to the open unit. On December 15, 2004, he returned to SHU for disciplinary segregation after being in a fight with a peer. Shortly thereafter, he began refusing meals and to interact with staff. He also began urinating on the floor of his SHU cell. He reported to nursing staff that, if he urinated in the toilet, the FBI would come and obtain a urine sample. Over the next several weeks, he continued to urinate on his cell floor and to refuse meals.

14. On January 20, 2005, Respondent finished his disciplinary segregation status and was returned to the open hospital unit. On January 28, 2005, he received an incident report for refusing to obey an order and was reassigned to SHU. When in SHU, his pattern of refusing meals and urinating on the floor continued. Respondent told staff on one occasion that he urinated on the floor as a "kind of protest." Small dried brown areas were also noted on the floor but Respondent denied that this was fecal material.

15. In early February 2005, Dr. Shine and other members of the mental health staff at FMC Rochester held a difficult case conference to discuss Respondent's symptoms and possible treatment. On February 14, 2005, Respondent's condition had so deteriorated that he received emergency psychiatric medication. At that time, his room sanitation was extremely poor; he was urinating on the floor, refusing to use the toilet apparently due to his delusional belief that the FBI was collecting his urine; traces of feces were noted. Respondent had fasted for long periods of time, resulting in a 50 pound weight loss from early in the year. He refused all communication with staff and often remained in bed, completely covered by a blanket. He also refused evaluation of his physical health and his vital signs.

16. Following the emergency medication, Respondent showed slight behavioral improvement. However, he refused to take psychiatric medication voluntarily, denying that he has a mental illness or needs treatment. On February 25, 2005, Respondent was moved to the Martin Unit where he was housed at the time of the hearing.

17. Respondent posted several statements on the wall of his cell and on pieces of paper. According to Dr. Shine's testimony and his March 10, 2005, Report of Evaluation, those writings include notes about a "transponder," about persons be assessed millions of dollars for their "violations," and others set forth in Exhibit 2.

18. Although he remained extremely guarded with mental health staff, on March 9, 2005, Respondent talked at length to a group of nursing students. He described several bizarre and paranoid ideas. For example, he said that all his interactions were recorded by tape and microphones. He described his "protest" by urinating in SHU due to the "investigation." He said that the doctors were trying to give him medication so the investigation could continue, and he would be forced to urinate in the toilet. He talked about his view that, if he eats kidney beans, his kidneys are formed. He spoke of water being placed in a toilet and swirling in a circle and of how the circle of the toilet seat brings all of us into the circle of the investigation. Respondent also stated that he did not have a mental illness and did not need treatment.

19. According to Dr. Shine's testimony, Respondent is not currently urinating on the floor in his cell. However, he continues his pattern of often refusing meals, eating only food he purchases from the commissary or food he takes from the trays of other inmates. He also refuses to be weighed or to allow an evaluation of his physical condition or of his vital signs. He interacts only intermittently with staff. On the day of the hearing, he was lying on his bed with his head covered and declined Dr. Shine's invitation to attend the hearing.

20. Dr. Shine opined, to a reasonable degree of medical certainty, that Respondent suffers from a severe and persistent mental illness, namely, Schizophrenia, Paranoid Type, based upon Respondent's several-year history of very poor psychiatric and behavioral adjustment in a variety of institutions, his paranoia, including extreme reluctance to interact with staff, his food restriction and bizarre and unsanitary behavior such as urinating on the floor, his bizarre thought content and his aggressive behavior (fighting). Dr. Shine also testified that Respondent has displayed some behaviors that indicate he suffers from

hallucinations. For example, Respondent described hearing music and voices in the past. He said he could close his eyes and see people involved in the investigation.

Based upon this testimony and evidence, the Court finds that Respondent currently suffers from a mental disease of defect.

### B.     Respondent is in Need of Custody for Care of Treatment

Although 18 U.S.C. § 4245(d) does not define when a prisoner is "in need of custody for care or treatment," courts have found that prisoners are "in need" of treatment under 18 U.S.C. § 4245 where a diagnosis is properly supported by psychological and psychiatric testimony. Horne, 955 F. Supp. at 1146; United States v. Eckerson, 299 F.3d 913, 914 (8th Cir. 2002) (applying the legal standard for determining when an inmate is in need of treatment adopted in Horne). Deeming an inmate is in need of treatment is appropriate if he is unable to function in the general prison population because of his mental disease of defect. Horne, 955 F. Supp. at 1149.

The Court finds that the government has shown, by a preponderance of evidence, that Respondent is in need of treatment for his mental illness, based upon the testimony of Dr. Shine and on Exhibits 1 through 5. In addition to the findings set forth above, the Court finds the following:

1. Dr. Shine testified that Respondent has no insight into his mental illness which prevents him from recognizing that he has a mental illness for which he is in need of treatment. Other than the emergency antipsychotic medication Respondent received in February 2005, the medication he voluntarily took briefly in May 2004, and a brief stay in the inpatient unit in May 2004, in which he participated in some therapy, Respondent has refused all care and treatment offered to him.

2.  Dr. Shine opined that, at this time, Respondent is unable to function in a less restrictive

environment than the semi-locked Martin Unit and is unable to function outside a hospital setting. One of the goals of treating Respondent is to return him to a mental health status so that he can take part in mental health and institutional programs and move to an open housing unit.

3. According to Dr. Shine, the nature of Respondent's mental illness is such that it will not spontaneously remit. If he is not treated, Dr. Shine anticipates that Respondent's mental illness would continue and that it would episodically deteriorate. On the other hand, if Respondent is committed for care and treatment, his prognosis is good; he will likely regain his ability to function in the correctional environment. Dr. Shine believes, to a reasonable degree of medical certainty, that Respondent is in need of custody for the care and treatment of his mental illness.

Based upon this testimony and evidence, the Court concludes that Respondent is in need of custody for care and treatment of his mental illness.

### C. FMC Rochester is a Suitable Facility

The Court finds that FMC Rochester is a suitable facility for Respondent to receive care or treatment based upon Dr. Shine's testimony and Exhibit 2. FMC Rochester is a fully accredited hospital providing a wide range of medical and therapeutic options, including appropriate psychiatric medication, psychotherapy, activity therapy and psychoeducational rehabilitation, as well as a variety of housing options. Dr. Shine opined that Respondent could not get the type of multidisciplinary treatment he needs at mainline Bureau of Prisons institutions but rather needs the kinds of treatment offered at FMC Rochester.

Based upon this testimony and evidence, the Court finds that FMC Rochester is an appropriate facility for Respondent's care and treatment.

## **RECOMMENDATION**

For the reasons set forth above, it is **HEREBY RECOMMENDED** that:

1. The Petition to Determine Present Mental Condition of an Imprisoned Person Under 18 U.S.C. § 4245 **[Docket No. 1]** be **granted**;

2. Respondent be found to be presently suffering from a mental disease or defect for the treatment of which he is in need of hospitalization in a suitable psychiatric facility;

3. FMC Rochester be deemed a suitable facility at which to treat Respondent's mental illness;

4. Respondent be committed to the custody of the United States Attorney General; and

5. The Attorney General hospitalize Respondent at FMC Rochester for the care and treatment of his mental disease or defect.


Dated: May 10, 2005

    s/Arthur J. Boylan
ARTHUR J. BOYLAN
United States Magistrate Judge


Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before **May 25, 2005** a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.